I'm going to say this wrong, but I think it's pronounced Gagne. It is. Good. I'll be glad to hear from you. May it please the Court. My name is Joe Gagne, along with my co-counsel, James Ardoin. Go ahead. We represent the appellant in this case, Adley Abdulwahab, who I'll refer to as Mr. Wahab for short. Mr. Wahab raised two issues on appeal, and I'll begin with the first part of the first issue, and that is that Mr. Wahab's convictions for money laundering or based on money laundering were barred by the merger problem that was articulated by the Supreme Court in the United States v. Santos. This has nothing to do with you. No problem. This is not a bad sign. It's a bad sign for Judge Gregory and me. At the very least, you need the briefs for this type of case. It's not an incredibly complicated case. The United States v. Santos, if you'll recall, was a case where the defendant was running an illegal lottery under the Indiana state law, and he had employed runners that would go and collect the bets from people at bars and restaurants, and then those runners would take the bets to collectors that were employed by the defendant, and then the collectors would give the money to the defendant. The defendant would use that money to pay the salaries of the runners, pay the salaries of the collectors, and then pay out the winnings of the illegal lottery. And what the Supreme Court said was that an individual could not be convicted of money laundering for paying those expenses for the underlying criminal activity, and that's similar to what occurred in this case. In this case, Mr. Wahab worked for A&O, and they were selling fractionalized interest in life settlements. They called them bonded life settlements. Do you think that the payment of the commission to him is just integral to the fraud itself? Absolutely, Your Honor. The payment of those – essentially the people that were doing the selling was not Mr. Wahab. Mr. Wahab recruited wholesalers who then in turn recruited sales agents. And so after the sales agents would solicit investments from potential investors, that money would be transferred to Mr. Wahab, who would then take a portion of that money to pay commissions for those sales agents, which would go to the wholesalers and the sales agents. So these were the expenses of that underlying criminal activity. This court's addressed similar issues in two cases, United States v. Halstead and United States v. Cloud. Of course, I don't have to be prescient to know that the government will stand up here and say that this case is more like Halstead than Cloud, but Cloud has already addressed that very similar issue. You'll recall that in United States v. Cloud, the defendant there was running a mortgage fraud scheme, and he had hired different mortgage professionals to go out and recruit people with good credit to fill out these applications to buy homes that the defendant had already purchased and was flipping to these potential investors. And then Mr. Cloud would take a portion of those proceeds and pay out money to the people that had helped recruit the other mortgage professionals. And the court said that that was significantly different than what had occurred in Halstead. But it's not just the fact of the payment. A payment to somebody could be money laundering, correct? Correct. A payment could be money laundering. And it also could be, in your assessment, a merger issue because it's integral to the actual fraud itself. That's absolutely correct. How do we know how we sort of demark or encapsulate or entitle that payment? How do we do it? That's part of what Justice Stevens in Santos directed the courts to do. You'll recall that Justice Scalia, who authored the opinion stating that we should look at the rule of lenity and any time this problem arises. How do we do it in this case? What do we look at? So in this case, you look at the purpose for which these payments were given. How do we know that from the testimony, from the indictment? What do we look at? Well, the facts of the case. The evidence showed that A&O had lured Mr. Bromseth was the sales agent. So they lured him into the conspiracy with promises of payment, and this was evidence that the government put on through Mr. O'Connell. The basis of the mail fraud charges involved the investor contracts that were mailed by A&O to Mr. Bromseth, and then he received those contracts, and he then in turn delivered them to the investors. The basis of the money laundering convictions were those payments of the commissions to Mr. Bromseth by A&O for those contracts that he had solicited. So this was the entire basis of those payments. But even beyond that, the government, when the motion for judgment of acquittal was raised, the government argued to the district court, and I quote, if Mr. Abdulwahab and his co-conspirators had not paid salesmen like Mr. Bromseth, sales would have stopped and money would have stopped coming in. The whole reason Mr. Bromseth sold not one or two but several of these investments was because he continued to get commission payments. So the very reason, the very basis for these commission payments was remuneration for the sales that Mr. Bromseth had conducted in moving this illegal activity forward. And that's why this case is so different than United States v. Halstead. In Halstead, the payments were not remuneration for any activity. In Halstead, the payments, it was a health care fraud scheme where the payments were coming back to the defendant who would then take that money and use it for purposes that were wholly unrelated to the underlying illegal activity. So he wasn't reinvesting that money back into the business. This case, like in Cloud, like in Santos, they're reinvesting the money back into the business by paying these commissions. So all they're doing is paying remuneration for illegal activity that's already occurred. The government also seizes on the issue that, in their opinion, the fraud was complete at the time of the payment, at the time that these investor contracts were mailed. And that simply isn't true. Although it is a mail fraud scheme, it's not the issue that the scheme to defraud begins and ends with the use of the mail. The use of the mail was simply in furtherance of the scheme to defraud. But what the court looks at is the scheme to defraud itself. And in this case it was soliciting potential investors with the use of false statements. In the indictment itself, all those claims of payment under money laundering are all those commissions as the evidence. Correct, Your Honor. Undisputedly commissions as the evidence that the trial showed. That's correct. They were indicted as commissions, and then the evidence in trial showed that they were payments of commissions. That was, in a nutshell, essentially what their evidence was for money laundering. And that's why this case is similar to Cloud and dissimilar to United States v. Halstead. I think there's also, when I was looking at this issue, there was a bit of a misconception I think with some of the courts post the amendments to this statute. As you recall, the statute was amended in 2009 after the United States v. Santos opinion came down. And there were some courts, or at least some commentary, that alluded to the fact that perhaps Santos had been overruled. That simply isn't the case. Congress never intended for this stuff to be just okay and kosher all along. The warning that Justice Scalia gave that where he said to give the government this power essentially is to give them the authority to add a money laundering charge to almost every single case that involves illegal activity and money. That warning, it still rings true, and because it's reflected in the new statute. Because it requires that the government, when it's presented with this merger issue, it has to submit the reasons for the money laundering charge not just to the senior Department of Justice officials or the United States Attorney, but it also has to submit a report to the Attorney General, to the House and Senate Judiciary Committees, which details the prosecution and details why the prosecution went forward with these money laundering charges. So the fact that Congress has now amended this statute doesn't mean that this wasn't a problem from the get-go. And if there aren't any other questions about the merger issue, if the court has any questions about the other issues that I raised, I'll be happy to address them. If not, I'll yield the rest of my time to the court. Let me ask this one question. Sure. The net result, if you're right on this, would be what? It would be resentencing. And with the sentence, could the sentence be the same? The sentence could be the same ultimately, but this was a bundled sentence that the district court gave, taking into consideration the underlying charges. Thank you. Ms. Brumberg. Good morning, Your Honors. May it please the court. My name is Jessica Abre Brumberg, and I represent the United States of America. The government asks that you affirm Mr. Abdul-Wahab's convictions and sentence for the reasons outlined in our brief. But primarily, I will address the court's concerns about the money laundering counts in this case. Simply put, the district court did not err in denying the Rule 29 motion of the defendant as to the money laundering counts. Judge Shedd asked whether the payments of the commissions were integral to the scheme here, and that comes to the heart of the government's argument here. The mail fraud scheme did not merge with the money laundering offenses because the mail fraud scheme was finished by the time the money laundering offenses occurred. The mail fraud was pled and argued, and the evidence supported, in a manner that showed that the mail fraud scheme was complete well before commissions ever came about. And that renders this case much more like Halstead, in which the illegal activity was completed before the money transactions occurred. Did the mail fraud scheme in any way depend on the actions of the persons who received commissions? No, Your Honor. And I say that because it certainly was helped, and that is what the government argued, that the commissions incentivized sales agents, like Mr. Bromseth, to sell the product. But the critical... That's not what I asked you. I said, was the mail fraud complete without and before the actions of those who later received commissions? Your Honor, I apologize. Yes, it was complete. I misunderstood. It was complete in that the elements of mail fraud are in essence here that money was obtained under false pretenses. Who obtained the money? A&O, sometimes through sales agents like Mr. Bromseth, sometimes from principals like Mr. Wahab directly pitching to potential investors. But the fact of the matter is that in counts two and three, for example, the substantive mail fraud counts, investors F.S. and C.C. heard lies about the A&O product, wrote checks, and then the mail fraud was complete. The fact that Mr. Bromseth got a check later to thank him for his service and to pay him for his services rendered does not affect the actual mail fraud counts. Whether or not Mr. Bromseth got paid does not affect whether investors F.S. or C.C. Wait a second. I want to follow this. I'm going to break it down into two classes of people. One is those, Leslie, I don't understand. You seem to be making a blended argument. Are you saying there are people who committed mail fraud who received no commissions? I don't believe there is any evidence of the record that . . . I don't believe that there's any evidence that folks sold this product that didn't receive commissions. In the end, everyone received something for pitching the A&O product. A commission? Yes, Your Honor. I believe that's correct. I think Judge Shea's question to you, I think I understood it, was that he asked was the mail fraud completed before the actions of the persons who received commissions were done? You said it was? Yes, Your Honor. How could it? I thought the pitch was part of it to make the mail fraud occur. They have to be induced with, as you say, lies to get them. So their actions started before the mail fraud ended. I'm sorry, Your Honor. I'm just not following. Well, the people who received commissions, correct? Yes, Your Honor. They did some things. Did they start doing those things before the mail fraud ended? Yes, Your Honor. And I think I understand now what you're asking me. The sales agents commenced their pitch, their presentation to the investors, in advance of the money of the investors deciding to invest and sending their money. So that is correct. They were just being paid after some of those things happened. But it would be different, I suppose, if what they did, everything they did occurred after the mail fraud ended. But it didn't. You just conceded it. It's in the res gesta, if you will, the thing happening. Well, it would be factually disingenuous to suggest that everything that Mr. Bromseth did occurred after the investor paid their funds. But in that instance, I ask you to consider that Mr. Bromseth was not a member of the conspiracy. And I think that was mistakenly stated by the appellant. Mr. Bromseth was not a co-conspirator. He's not like the cloud participants in that way. He pled guilty to mail fraud, but only for the results of his own criminal actions and did not know what was going on. But if you say that the actions of those, I think you changed your answer. Now the question has been clarified, but it's the same point that Judge Gregory has been asking. If the actions of those who later received commissions were necessary to the mail fraud, is that what you now say? No, Your Honor. Then you changed it again. I apologize. I genuinely am not trying to change the government's argument. Do you understand the question? Am I being clear enough? Perhaps I don't. I'm just trying to find out. I don't want to focus right now on the pain of the commission. I want to put that aside for a second. Okay. Because I don't want to focus on that. I want to focus on was that you said the mail fraud was complete before any actions or the actions of those who later received commissions. I'm trying to get to the point is was the actions of those people, were those actions necessary to the mail fraud? I understand, Your Honor. Were they or were they not? Their actions, the sales agent's actions commenced prior to the completion of the mail fraud, and thus the government would say they're still not necessary. But I understand in the— All right, let me ask you this way. You would have had a mail fraud without the actions of the people who received commissions? No, Your Honor. Well, you know, I don't think you understand my question because every time I ask you, you answer it a different way. My point is it seems to me, and I'm not trying to trick you, if the actions of this group of people are essential to the mail fraud, then we decide what do we do with money they received. And then I'm going to ask, is it a timing thing? If they had received a commission like a draw looking forward, what would that matter? But we can't get to the basic information. Without these people who were working for a commission, would there have been a mail fraud? I think based on the record before the court, it would have been virtually impossible to have a mail fraud. The answer, no mail fraud. No mail fraud, no. So then that sounds to me like those people are integral, a necessary part of the mail fraud. Isn't that what that sounds like? Yes, Your Honor. So why then is there a receipt of money for their actions, payment for their actions? That seems to me to be part of the mail fraud. Your Honor, I think the distinction, and again, I do want to apologize to the court if it seems like I'm being evasive. I'm not. No, I just think you didn't clearly understand for some reason. Yes, Your Honor. The fact of the matter is, although Mr. Bromseth's actions may have been and were necessary to the mail fraud, the payment to him was not necessary to the mail fraud. So you think it's just a question of timing? If they'd given him a draw that commissions would later go against, would that have made his actions part of the mail fraud? Potentially more so. But in this instance, all of the payments happened after the investors paid their funds to ANO. So you think it's not the role that the actor's actions played in the fraud, which you say were essential, but it's when they got their check. That makes a difference? This is a very fact-specific case by category. Oh, but I'm talking about the facts of this case. Your theory is the timing of their check arriving determines whether or not it's money laundering or part of the mail fraud. In this instance, it is a relevant factor in the analysis. That distinction doesn't really seem to make much sense. Well, Your Honor, these cases are all very difficult to fit together, candidly. But I'm asking in your theory of the case, does that really make much sense? That if somebody had gotten their check hand-delivered to them one second before the person decided, and another person got it one second after, one would be money laundering and one would not be money laundering? That would be a better argument for the appellant. But in this instance, the checks did, as a matter of fact, come after the investments. And in Counts 9 and 11, I would direct the court's attention to the more distinctive nature of those payments in contrast to 12, 13, and 14. Counts 9 and 11 are charged as the payments not from A&O to the marketing company, HIC, but the second leg from HIC to Mr. Bromseth. And so those payments are even more distant from the heart of the mail fraud. But they're all for payments for actions, which actions you say are absolutely necessary for the mail fraud. That is correct, Your Honor. But the fact of the matter in the record is that A&O did not know how HIC was going to divide up these commission payments, nor did they care. A&O simply wanted to pay Mr. Wahup's marketing company the 10% generally to incentivize agents to sell the product. If we were to agree with the appellant's argument that these are essential expenses rather than a distribution of profits, can Count 8 stand, which is a conspiracy count? And if so, tell me what evidence you would rely upon to justify sustaining Count 8. Count 8 should stand, Your Honor. Count 8 is the conspiracy to commit money laundering. And in Cloud, the court distinguished that from the other substantive counts by saying that the conspiracy wasn't tied to a particular payment. So when you're asking me what evidence is in the record as to the other types of expenses as to the money laundering, I would point you to Mr. Bromseth's testimony generally that he received quite a bit of money, $232,000 from investments. But I will admit that all of the evidence in the record pertains to commissions paid to sales agents. There are no other types of payments constituting money laundering in the record. But more to the point is that this issue does not affect Mr. Wahup's sentence. As Your Honors can see, the sentence of 60 years was driven by Counts 1, 2, and 3. And all of these money laundering counts and securities fraud counts run concurrent to those mail fraud counts. And although the court asked whether a resentencing was the necessary remedy, it is possible this court can certainly order a resentencing. But it is not a requirement in this instance. Judge Payne made it crystal clear, the district court, that it was his intention to impose a sentence of 60 years. Well, if you're right, then there's no harm done by remanding it. Exactly, Your Honor. That said, the, you know, practical and financial concerns of remanding to do a full resentencing as opposed to one in which we simply wipe out the special assessments are sort of two different types of resentencings here. The guidelines are not affected by the omission of the money laundering counts. And in either way, Mr. Wahup is at a 43, the literal end of the sentencing chart. And the court already imposed a downward variance. So to some extent, it would be somewhat a waste of time and resources to do a full resentencing when, in fact, what is effectively appropriate is to eliminate the special assessments here. The appellant thinks it would be a waste of time to have a resentencing? Oh, certainly he doesn't. But in the global sense, in that nothing about the sentencing has changed in terms of the guideline factors, the evidence before the court, the stated intention of the court, the downward variance he already got. As a steward of the government, Your Honor, I'm simply looking forth. And trying to protect judicial resources. Yes, Your Honor, absolutely. Have you looked at any cases that have the situation where part of the convictions might be reversed to see what our normal practice is? As best I can tell, this is, I have looked. I'm not finding anything exactly on point. But I can see that the guiding factor in Pepper is that you have the authority to order a remand, but it's not a requirement, that it's discretionary. And so the government would ask you to exercise that discretion in using judicial resources wisely and simply ask that the special assessments be struck if you find that there is a merger problem in this case. Unless, given the posture of the court, unless there are any other questions about the other issues raised, I will yield the rest of my time. And so thank you for the foregoing. All I just wanted to say was for the foregoing reasons, we respectfully request that you please affirm Mr. Wahab's conviction and sentence. Thank you. Thank you. Mr. Gagne? Mr. Gagne? A few brief points to make on rebuttal, and I will be terse. I seized on one thing that the government said, and that was that the payment was not necessary to the mail fraud. In order to believe that, the government would be required to believe that Mr. Bromseth solicited these potential investors just because he had nothing better to do, and that simply wasn't the case. The sole reason why he went out and solicited investors, the sole reason why he marketed this product, was because he was promised commissions. If it wasn't for those promises of commissions, he would not have been involved in this conspiracy. Make no mistake, he was charged as a co-conspirator. He was charged with conspiracy. The fact that he pled guilty to mail fraud does not mean that he was not a co-conspirator. He was part and parcel to this scheme to defraud. Can you answer Judge Traxler's question to the government? Can the conspiracy stand if these counts fall? Absolutely not. Everything that the conspiracy was based around was paying these commissions to these salespeople because that was the underlying agreement. This was a scheme set up by Mr. Allmendinger, Mr. Oncal, and then later joined by Mr. Abdulwahab, where Mr. Abdulwahab went out and recruited wholesalers, and he recruited those wholesalers on the basis of promising to pay these commissions. He wasn't asking them to do any type of altruistic jobs around the community to find investors to make money. They were selling a product. They were selling a bonded life settlement, and none of those sales would have taken place if it wasn't for the payment of these commissions, and each one of the charges in the indictment for money laundering were all based around the payment of these commissions. So it's impossible to believe that this mail fraud scheme would have occurred or the securities fraud scheme would have occurred if it was not for the activities of these salespeople who were lured by the promises of these commissions. And then briefly I would also address the point that the government made that this court should not remand the case out of a concern for judicial resources. And, of course, judicial resources are not only germane to the government. Everybody that's working in the court cares about them, but the government's not in a position to determine what's in the mind of Judge Payne when sentencing this case. Was there any evidence in the record that there was at least someone conspiring to make payments that were not commission payments, putting money somewhere else, putting money in their savings account, transferring money other than commission payments? No, not that I'm aware of. There was money spent by Mr. Allmendinger, Mr. Oncal, Mr. Abdulla that were not commission payments, but those weren't charged in the indictment as money laundering, and those transactions also were not part of the scheme to defraud and were not charged conduct. But now for a conspiracy to commit money laundering, you have to allege specific transfers? Or you at least have to allege that there was a scheme to engage in the transfer of money or wealth or assets. They didn't allege that in this case other than these payments. Is there evidence that there were payments by these folks, anybody alleged to be in the conspiracy other than for the commissions? No, not that I'm aware of. I don't recall any payments in the record or any mention of any payments other than the payments of these commissions. Any commission of any plan to make such payments? Like somebody said, I was going to use this to pay off debts or anything like that. Or he'd said that or something like that. I'm just wondering if there's a way, if there is, because you could have a conspiracy to make a payment in a conspiracy for money laundering. If it was outside the commissions, you might well have that. You understand my question? Yes. You just say you can't think of anything in the record. No, no. To briefly continue the sentencing issue, the government's not in a position to know what Judge Payne would do with this case on resentencing. The fact was that there were several money laundering counts. Each one carried a 20-year sentence. And when Judge Payne granted a downward departure, he would be starting at a much lower ceiling and granting that downward departure if this court were to remand. So although Judge Payne could issue the same sentence, there's no way to know that he would, and he should be given that opportunity to do that because this was a bundled sentence. And if there are no further questions, I would appreciate the time from the court, and I would ask this court to reverse these convictions. Thank you, Mr. Gagne. We'll come down and greet counsel. Thank you. We'll go into the next case.
judges: William B. Traxler, Jr., Roger L. Gregory, Dennis W. Shedd